SANFORD (RHINELANDER v.). See Case No. 11,739.

SAN FRANCISCO (BAYERQUE v.). See Case No. 1,137.

SAN FRANCISCO (HOADLEY v.). See Case No. 6,544.

## Case No. 12,316.
### SAN FRANCISCO v. UNITED STATES.
[4 Sawy. 553.] [1]

Circuit Court, N. D. California. Oct. 31, 1864.

MEXICAN GRANTS — PUEBLO —WHAT CONSTITUTED —BOUNDARIES AND USES—DISPOSAL OF PUEBLO LANDS—DISTRICT ATTORNEY.

1. In the San Francisco Pueblo Case, both the United States and the city having appealed from the decree of the land commission confirming the claim of the city, and the United States having subsequently withdrawn and dismissed their appeal: *Held*, that such dismissal of the appeal on the part of the United States may be regarded as an assent by the government to the main facts upon which the claim of the city rests, namely: the existence of an organized pueblo at the site of the present city upon the acquisition of the country on July 7, 1846; the possession of such pueblo of proprietary rights in certain lands; and the succession to such proprietary rights by the city.

[Cited in U. S. v. Vallejo, 1 Black (66 U. S.) 562; Grisar v. McDowell, Case No. 5,832; Montgomery v. Bevans, Id. 9,735; Knight v. United States Land Ass'n, 142 U. S. 161, 12 Sup. Ct. 261.]

2. A pueblo of some kind, having an ayuntamiento, composed of alcaldes, regidores and other municipal officers, existed at the site of the present city of San Francisco as early as 1834, and continued in existence until and subsequent to the cession of the country to the United States.

3. By the laws of Mexico in force at the date of the conquest, a pueblo or town, when once established and officially recognized, became entitled, for its own use and the use of its inhabitants, to four square leagues of land.

[Cited in Brownsville v. Cavazos, 100 U. S. 139.]

4. Though in some instances under the Mexican laws an officer was appointed to mark off boundaries of the four square leagues to which new pueblos were entitled, and to designate the uses to which particular tracts should be applied, yet the right of the pueblos and their inhabitants to the use and enjoyment of the lands was not made dependent upon such measurement and designation.

5. The government retained the right to control the use and disposition of pueblo lands, and to appropriate them to public uses until by action of the city authorities, they were vested in private proprietorship.

6. The lands assigned to pueblos, whether by general law regulating their limits to four square leagues or by special designation of boundaries, were not given to them in absolute property with full right of disposition and alienation; but to be held by them in trust for the benefit of the entire community, with such powers of use, disposition and alienation as had been already or might afterward be conferred upon them or their officers for the due execution of the trust.

7. The United States attorney is the regular officer of the government, having charge of all

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

its legal proceedings within his district, subject only to the general direction and supervision of the attorney-general; and when other counsel are employed in these proceedings, it is to aid him in their management, not to assume his authority or direct his conduct.

[On transfer from the district court of the United States for the Northern district of California, pursuant to act of July 1, 1864.]

This case, involving the title of the city of San Francisco to the pueblo lands, was originally commenced by the filing of a petition by the city before the board of land commissioners on July 2, 1852. The petition set forth a claim made by the city to so much of the northern portion of the peninsula of San Francisco as would contain an area of four square leagues, upon the ground that upon the acquisition of the country, July 7, 1846, the then pueblo, now city, of San Francisco, was a town having a population of about one thousand inhabitants, and that under and by virtue of the laws of Mexico, it was entitled as such pueblo, to this quantity of land. There was much testimony taken and a number of able counsel engaged, and after a very thorough presentation of the case, the land commissioners, on December 21, 1854, filed their decree confirming to the city all the land south of the fort and casamata at Fort Point, and north of a line running from the southern part of Rincon Point through Lone Mountain to Point Lobos, and known as the "Vallejo Line." The decree did not contain any exceptions or reservations, and did not refer to the character or nature of the title held by the city; but was in terms merely a confirmation of the claim made by the city, within the limits mentioned, particularly describing them. In rendering their decision, Commissioners Thompson and Farwell concurred in the prevailing opinion, and Commissioner Felch filed a dissenting one. The former discussed at great length the Spanish and Mexican laws in reference to pueblos, the various documents and evidence presented in the case, and among others, the so-called Zamorano document. This paper, since ascertained and admitted to be spurious, purported to be a copy of a letter from Governor Figueroa to General Vallejo, dated Monterey, November 4, 1834, containing an approval by the government of a plan therein referred to as having been presented by General Vallejo in reference to the pueblo of San Francisco, adopting the Vallejo line, which had been marked out by him, as the boundary, and providing for the installation of the first ayuntamiento, or town council there. It was called the Zamorano document from the fact that it purported to be attested as a true copy by Zamorano, formerly secretary of the territorial government of California. Besides the Zamorano document, there were several other documents introduced and discussed, as to the genuineness of which no question has been made, showing or tending to show the existence of an ayuntamiento either at the presidio of San Francisco or at the Mission Dolores as early as 1834 or 1835. Upon this branch of the subject, and for the purpose of exhibiting the general character and style of reasoning of the prevailing opinion, the following extract therefrom may be given:

"It is probable, from the testimony, that when the pueblo was first organized, the site of the village or town proper was intended to be at the presidio; but subsequently, from the superior advantages of the anchorage at the place called Yerba Buena, that point was selected as the most eligible for that purpose. It appears from the deposition of Wm. A. Richardson, and the communication of Governor Castro annexed thereto, that in the autumn of 1835 Richardson was employed to lay off and make a plan of a town at that point, which plan was communicated to the governor and approved by him. About the same time the resolution of the deputation was passed, authorizing the ayuntamiento to grant building lots at that place, which was communicated to the municipal authorities in the order of Governor Castro of the twenty-sixth of October, 1835, and dated just six days after the communication to Richardson approving the plan of the town as submitted by him. There is an evident attempt in the testimony of Richardson to make it appear that the municipal organization here referred to was for a pueblo at the Mission Dolores or San Francisco de Asis, as it was indifferently called. But this is so palpably contradicted by the other evidence in the case, both documentary and oral, and so inconsistent with the other parts of his own testimony, as to entitle it to no weight whatever."

"It is objected further, that even admitting these proceedings to be sufficient for the establishment of a pueblo, so far as the territorial authorities were concerned, that in order to give them effect and validity under the law which authorized them, the approval of the supreme government was necessary. This is unquestionably true, and we accordingly find that the resolutions of the territorial deputation directed that they should be communicated to the government at Mexico for that purpose. There is no evidence in the case that such approval ever was had; but the resolutions to that effect were doubtless sent to the government by Governor Figueroa, as we can scarcely imagine that one who was so punctual and exact in the discharge of all his official duties, would have neglected it in this instance. The existence of the pueblo appears to have been uniformly recognized by the public authorities from that time, and its civil officers continued in the exercise of their functions without any question as to their authority or the legality of their acts up to the change of government, a period of nearly twelve years. Such approval, therefore, according to well recognized legal principles, would be presumed."

The conclusions arrived at by Commissioners Thompson and Farwell were stated by

them at the close of their opinion, in the following language:

"First. That a pueblo or town was established under the authority of the Mexican government, in California, on the site of the present city of San Francisco, and embracing the greater portion of the present corporate limits of said city. Second. That the town so established continued and was in existence as a municipal corporation on the seventh day of July, 1846. Third. That at or about the time of its establishment, certain lands were assigned and laid off in accordance with the laws, usages and customs of the Mexican nation, for the use of the town and its inhabitants, and the boundaries of said lands determined and fixed by the proper officers appointed for that purpose by the territorial government. Fourth. That the boundaries so established are those described in the communication from Governor Figueroa to M. G. Vallejo, dated November 4, 1834, a copy of which is filed in the case, marked Ex. No. 18, to the deposition of said Vallejo. These conclusions bring the case, in our opinion, clearly within the operation of the presumption raised in favor of a grant to the town by the fourteenth section of the act of the third of March, 1851 [9 Stat. 634], and entitled the petitioner to a confirmation of the land contained within the boundaries described in the document above mentioned."

Commissioner Felch, in his dissenting opinion, held that the testimony failed to establish the foregoing conclusions arrived at by his associates, and presented a number of reasons tending to show, as he claimed, that there had not been established any municipal organization of a town within the limits described in the decree of confirmation. But at the same time he held that the city was entitled to the presumption of a grant in her favor, under the fourteenth section of the act of March 3, 1851. His language, forming the close of his opinion, was as follows:

"Proof is given of the existence of a small town known as Yerba Buena, on the site of the present city, on the seventh of July, 1846; this was requisite under the law to entitle the present corporation to a presumption of a grant; but this being proved, the presumption extends to the lots as they existed at the time of the passage of the act (of 1851), and was not confined to the limits of the original Mexican town. It was the American city as it existed in 1851, which congress had in its eye, and not the little germ from which it sprung, when it provided for making its corporation the depository of the titles to these lands, and this design of quieting the titles by the presumption of a grant to the city would fail to be secured, and the manifest object of the law be defeated, if all the lots within its chartered limits, at the time the act was passed, were not embraced in the decree of confirmation. Beyond these limits the petitioners have established no rights. The decree, therefore, should, in my judgment, be

entered in favor of the city for the lots within the corporation limits as described and established in the charter of 1850, and no more."

The decree of the land commission, which followed the prevailing opinion, was filed, as before stated, on December 21, 1854. Both parties were apparently dissatisfied; the city, because the entire claim had not been allowed, and the United States, because so much of it was allowed; and both gave notice of intention to prosecute an appeal to the United States district court, and to that court the case was taken. Afterward, in 1857, the appeal on the part of the United States was voluntarily withdrawn by direction of the attorney-general, and in accordance with a stipulation filed by the United States district attorney, the appeal was dismissed by the court, and an order entered giving the city leave to proceed upon the decree of the land commission, as upon a final decree. The city, however, declined to accept the proffered leave; but on the contrary, insisted upon its full claim, and continued to prosecute its appeal. Such was the condition of the case, and the position of the parties upon the passage of the act of July 1, 1864 (13 Stat. 332), authorizing a transfer of the case to the United States circuit court. In accordance with the provisions of that act, the district court, on the fifth of September, 1864, transferred the case to the United States circuit court. On the fourth of October following it was argued and submitted, and on the thirty-first of October was decided.

John W. Dwinelle and John H. Saunders, City Atty., for city of San Francisco.

Delos Lake, U. S. Atty., and John B. Williams, for the United States.

Briefs on behalf of the United States were also filed by Nathaniel Bennett, Edmund Randolph and Horace Hawes. The briefs were very elaborate, and were devoted mainly to the question of the existence, or non-existence, of the asserted pueblo under the Mexican government.

FIELD, Circuit Justice. This case comes before this court upon a transfer from the district court under the act of congress of July 1, 1864, "to expedite the settlement of titles to lands in the state of California." It was in the district court on appeal from the decree of the board of land commissioners, created by the act of March 3, 1851. It involves the consideration of the validity of the claim asserted by the city of San Francisco, to a tract of land situated in the city and county of San Francisco, and embracing so much of the peninsula, upon which the city is located, as will contain an area of four square leagues.

The city presented her petition to the board of land commissioners in July, 1852, asserting in substance, among other things, that in pursuance of the laws, usages and customs of the government of Mexico, and the act of the departmental assembly of California, of No-

vember, 1833, the pueblo of San Francisco was created a municipal government, and became invested with all the rights, properties and privileges of pueblos under the then existing laws, and with the proprietorship of the tract of land of four square leagues above described; that the pueblo continued such municipality and proprietor until after the accession of the government of the United States, July 7, 1846, and until the passage of the act of the legislature of the state of California incorporating the city; and that she thereupon succeeded to the property of the pueblo, and has a good and lawful claim to the same.

In December, 1854, the board of commissioners confirmed the claim of the city to a portion of the four square leagues, and rejected the claim for the residue. The land to which the claim was confirmed, was bounded by a line running near the Mission Dolores, and known as the "Vallejo Line." That line was adopted principally in reliance upon the genuineness and authenticity of the document described in the proceedings as the Zamorano document. The spuriousness of that document is now admitted by all parties. From the decree of the board an appeal was taken by the filing of a transcript of the proceedings and decision with the clerk of the district court. The appeal was by statute for the benefit of the party against whom the decision was rendered, in this case of both parties, of the United States, which controverted the entire claim, and of the city, which asserted a claim to a larger quantity of land; and both parties gave notice of their intention to prosecute the appeal. Afterward, in February, 1857, the attorney-general withdrew the appeal on the part of the United States, and in March following, upon the stipulation of the district attorney, the district court ordered that appeal to be dismissed, and gave leave to the city to proceed upon the decree of the commission as upon a final decree. The case therefore remained in the district court upon the appeal of the city alone, and that is its position here. But the proceeding in the district court, being in the nature of an original suit, the prosecution of the appeal by either party keeps the whole issue open. "The suit in the district court," said Mr. Justice Nelson in U. S. v. Ritchie, 17 How. [58 U. S.] 534, "is to be regarded as an original proceeding, the removal of the transcript, papers, and evidence into it from the board of commissioners, being but a mode of providing for the institution of the suit in that court. The transfer, it is true, is called an appeal; we must not, however, be misled by a name, but look to the substance and intent of the proceeding. The district court is not confined to a mere re-examination of the case, as heard and decided by the board of commissioners, but hears the case de novo, upon the papers and testimony which had been used before the board, they being made evidence in the district court; and also upon such further evidence as either party may see fit to produce."

But though the whole issue is thus open, the dismissal of the appeal on the part of the United States may very properly be regarded as an assent by the government to the main facts upon which the claim of the city rests, namely: The existence of an organized pueblo at the site of the present city upon the acquisition of the country by the United States on the seventh of July, 1846; the possession by that pueblo of proprietary rights in certain lands, and the succession to such proprietary rights by the city of San Francisco. The district attorney does not, therefore, deem it within the line of his duty to controvert these positions, but on the contrary admits them as facts in the case, contending only that the lands appertaining to the pueblo were subject, until by grant from the proper authorities they were vested in private proprietorship, to appropriation to public uses by the former government and, since the acquisition of the country, by the United States. He therefore insists upon an exception from the confirmation to the city, of land heretofore reserved or occupied by the government for public uses; and I do not understand that the counsel of the city objects to an exception of this character. It is unnecessary, therefore, to recite the historical evidence of the existence of a pueblo previous to, and at the date of, the acquisition of the country at the present site of the city of San Francisco, which is very fully presented in the elaborate opinion filed by the commission on the rendition of its decision. Since that decision was made, the question has been considered by the supreme court of the state; and in an opinion in which the whole subject is examined a similar conclusion is reached; and if anything were wanting in addition to the arguments thus furnished, it is found in the able and exhaustive brief of the counsel of the city.[2] The documents of undoubted authenticity, to which the opinions and the brief of counsel refer, establish beyond controversy the fact that a pueblo of some kind, having an ayuntamiento composed of alcaldes, regidores, and other municipal officers, existed as early as 1834; and that the pueblo continued in existence until and subsequent to the cession of the country.[3]

The action of the officers of the United

---

[2] See extracts from opinion of the supreme court of California in note A, annexed to the report of this case.

[3] In Grisar v. McDowell, 6 Wall. [73 U. S.] 372, the supreme court of the United States said: "It must be conceded that there was a pueblo of some kind at the site of the city of San Francisco, upon the conquest of the country by the United States, on the seventh of July, 1846. We say a pueblo of some kind, for the term which answers generally to the English word town, may designate a collection of individuals residing at a particular place, a settlement or a village, or may be applied to a regular organized municipality." See note B, annexed to the report.

States in the government of the city and the appointment or election of its magistrates after the conquest, both preceding and subsequent to the treaty of peace, proceeded upon the recognition of this fact; and the titles to property within the limits of the present city to the value of many millions rest upon a like recognition.

The material question, therefore, for determination, as the case stands before this court, relates to the extent of the lands in which the pueblo was interested. It is not pretended that such lands were ever marked off and surveyed by competent authority. It is admitted, as already stated, that the so-called Zamorano document given in evidence is spurious. The question presented must therefore be determined by reference to the laws of Mexico at the date of the conquest.

As stated by the commissioners in their opinion, there can be no doubt that by those laws, pueblos or towns, and their residents, were entitled to the use and enjoyment of certain lands within prescribed limits immediately contiguous to and adjoining the town proper; that this right was common to the cities and towns of Spain from their first organization, and was incorporated by her colonies into their municipal system on this continent; and that the same continued in Mexico, with but little variation, after her separation from the mother country. And there is as little doubt that by those laws a pueblo or town, when once established and officially recognized, became entitled, for its own use and the use of its inhabitants, to four square leagues of land. The compilation known as the Recopilacion de Leyes de las Indies contains several laws relating to this subject. The sixth law of title 5 of book 4 provides for the establishment of towns by contract with individuals, and upon compliance with the conditions of the contract, for the grant of four square leagues of land, to be laid off in a square or prolonged form, according to the character of the country.

The opinion of the assessor or legal adviser of the vice royalty of New Spain given to the commandante general in October, 1785, upon the petition of certain settlers in California, for grants of tracts of land situated within the limits claimed by pueblos, recognizes this right of pueblos to have four square leagues assigned to them. His language is that the grants "cannot and ought not to be made to them within the boundaries assigned to each pueblo, which in conformity with the law six, title 5, liber 4, of the Recopilacion, must be four leagues of land in a square or oblong body according to the nature of the ground; because the petition of the new settlers would tend to make them private owners of the forests, pastures, water, timber, wood, and other advantages of the lands which may be assigned, granted, and distributed to them, and to deprive their neighbors of these benefits. It is seen at once that their claim is entirely contrary to

the directions of the forementioned laws, and the express provision in article 8 of the instructions for settlements (poblaciones) in the Californias, according to which all the waters, pastures, wood, and timber, within the limits which in conformity to law may be allowed to each pueblo, must be for the common advantage—so that all the new settlers may enjoy and partake of them, maintaining thereon their cattle, and participating of the other benefits that may be produced."

But the royal instructions of November, 1789, for the establishment of the town of Pitic, in the province of Sonora, is conclusive as to the right of pueblos in California under the laws of Spain. These instructions were made applicable to all new towns that should be subsequently established within the general comandancia, which included the province of California. They gave minute directions for the formation and government of the new pueblos, and referring to the laws of the Indies already cited, declared that there should be granted to the towns four leagues of land in a square or prolonged form. They also provided for the distribution of building and farming lots to settlers, the laying out of pasture lands and lands for the propios, the residue to constitute the egidos or commons for the use of the inhabitants.

The general provisions of the laws of the Indies, to which these instructions and the opinion of the assessor refer, continued in force in Mexico after her separation from Spain. They were recognized in the regulations of November, 1828, which were adopted to carry into effect the colonization law of 1824, and in the regulation of the departmental assembly of August, 1834, providing funds for towns and cities. They were referred to in numerous documents in the archives of the former government in the custody of the surveyor-general. The report of Jimeno, for many years secretary of the government of California, found in the expediente of Doña Castro made in February, 1844, is cited by the commissioners in their opinion as removing all doubt on this point. The report is as follows:

"Most Excellent Governor: The title given to Doña Castro is drawn, subject to the conditions that were inserted in many other titles during the time of General Figueroa, in which they subjected the parties to pay censas (taxes) if the land proved to belong to the egidos of the town. I understand that the town of Branciforte is to have for egidos of its population four square leagues, in conformity to the existing law of the Recopilacion of the Indies, in volume the second, folios 88 to 149, in which it mentions that to the new town that extent may be marked, to which effect it would be convenient that your excellency should commission two persons deserving your confidence, in order that, accompanied by the judge of the town, the measurement indicated may be made, and it

may be declared for egidos of the town the four square leagues, leaving to the deliberation of your excellency to free some of the grantees of the conditions to which they are subject. The supreme judgment of your excellency will resolve as it may deem it convenient. Manuel Jimeno. Monterey, February 8, 1844."

The documents to which reference has been made are sufficient to establish the position that pueblos once formed and officially recognized as such, became by operation of the general laws entitled to have four square leagues of land assigned to them, for their use and the use of the inhabitants. It does not appear that formal grants were made to the new pueblos, though in some instances an officer was appointed to mark off the boundaries of the four square leagues, and to designate the uses to which particular tracts should be applied. But the right of the pueblos and their inhabitants to the use and enjoyment of the lands was not made dependent upon such measurement and designation.

It follows from these views that the pueblo, which is admitted to have been regularly established at the site of San Francisco on the seventh of July, 1846, was, as such pueblo, vested with the right to four square leagues of land, to be measured either in a square or prolonged form, according to the nature of the country, excepting from such tract such portions as had been previously dedicated to or reserved for public uses, or had become private property by grant from lawful authority.

It is difficult to determine with precision the exact character of the right or title held by pueblos to the lands assigned to them. The government undoubtedly retained a right to control their use and disposition; and to appropriate them to public uses until they had been vested in private proprietorship. Numerous laws have been cited to show that the title remained absolutely in the government. The same laws were cited to the supreme court of this state when the subject was before that tribunal, and in relation to them the court said: "We see nothing in these laws opposed to the views we have already expressed, that the towns had such a right, title and interest in these lands as to enable them to use and dispose of them in the manner authorized by law or by special orders, and consonant with the object of the endowment and trust. Undoubtedly the right of control remained in the sovereign, who might authorize or forbid any municipal or other officer to grant or dispose of such lands, even for the purposes of the endowment or trust. Such general right, with respect to a public corporation, exists in any sovereign state, and must, of course, have existed in the absolute monarchy of Spain, where the property of private corporations and individuals was to a great degree subject to the royal will and pleasure." Hart

v. Burnett, 15 Cal. 569. And referring to objections to the theory of absolute title in the pueblo, and the questions which upon that view might be suggested, the court said: "There is but one sensible answer to these questions, and we think that answer is given in the laws themselves, and in the recorded proceedings of the officers who administered them, and who must be presumed to have interpreted them correctly. It is, that the lands assigned to pueblos, whether by general law regulating their limits to four square leagues, or by special designation of boundaries, were not given to them in absolute property, with full right of disposition and alienation, but to be held by them in trust for the benefit of the entire community, with such powers of use, disposition and alienation, as had been already or might afterward be conferred for the due execution of such trusts, upon such pueblos, or upon their officers." Id. 573. And this view, the court adds, fully reconciles the apparently conflicting disposition of the laws and the commentaries of publicists respecting the relative rights of the crown and the municipalities to which counsel had referred.

In this view of the nature of the title of the pueblo and of the city, its successor, I fully concur; and I am of opinion that under the provisions of the act of March 3, 1851, the city is entitled to a confirmation of her claim. I regret that the recent transfer of the case to the circuit court, and the great pressure of other engagements since, have prevented me from considering at greater length the interesting questions presented. To those who desire to extend their inquiries, the elaborate opinions to which I have made frequent reference, and the able brief of counsel will furnish ample materials.

A decree will be entered confirming the claim of the city of San Francisco to a tract of land, situated in the county of San Francisco, and embracing so much of the peninsula upon which the city is located, as will contain an area equal to four square leagues as described in the petition. From the confirmation will be excepted such parcels of land within said tract as have been heretofore reserved or dedicated to public use by the United States, or have been by grant from lawful authority vested in private proprietorship. The confirmation will be in trust for the benefit of lot-holders under grants from the pueblo, town, or city; and as to any residue, in trust for the use and benefit of all the inhabitants. A decree will be prepared by counsel in conformity with this opinion, and submitted to the court.

In accordance with the foregoing opinion, a decree was entered on November 2, 1864, confirming the claim of the city, and on the same day an order was entered allowing an appeal in behalf of the United States to the United States supreme court. Soon afterward, one John B. Williams, an attorney,

claiming to act on the part of the United States, made a motion to vacate the order allowing an appeal, to open the decree, and to grant a rehearing in the cause. In December following, Delos Lake, United States attorney, under instructions from the United States attorney-general, joined in the motion. The proceedings and points made are fully stated in the following opinion rendered on denying the motion, filed May 11, 1865:

FIELD, Circuit Justice. This case was submitted to the court for its consideration on the fourth of October last, and was decided on the thirty-first of the same month. The decree confirming the claim of the city was settled and entered on the second of November, and on the same day an appeal was allowed at the instance of the United States to the supreme court.

On the fourteenth of November, John B. Williams, styling himself "special counsel" for the United States, gave notice that he would move the court on the twenty-first of the same month, to vacate the order allowing the appeal, to open the decree confirming the claim of the city, and to grant a rehearing of the case, upon the ground that the decision of the circuit court "was rendered under a misapprehension of the facts, and without considering the brief of the United States, which was suppressed by the clerk of this court." In support of the motion, the notice was accompanied with an affidavit of Mr. Williams. in which he states that he is "informed and believes" that the clerk of the court "unwarrantably and in derogation of" his (said Williams) rights "as a member of this bar, and of the rights of the United States as litigants in their own courts, suppressed" his briefs in the case, and "withheld them from the circuit judge, and that the arguments submitted in behalf of the United States were in consequence of such usurpation of power by the clerk, not considered by the circuit judge in his determination of the case, but that said cause was decided under a misapprehension of the positions taken by, and the proofs offered in behalf of the United States."

The affidavit contains other allegations based upon the assumption that the brief had been suppressed and withheld from the circuit judge. It also refers to certain concessions alleged to have been made by the district attorney, which will be particularly considered hereafter. .

In this proceeding the district attorney was not consulted, and that officer upon hearing of it, addressed a note to the "special counsel," refusing his assent to the motion, and stating that all motions and other proceedings in the conduct of the cause must be made by him. Mr. Williams, however, persisted in the motion, and endeavored to have the same heard by the district judge, who did not sit in the case or participate in its decision.

The position of the district attorney in claiming the control of the cause was entirely correct. He is the regular officer of the government, having charge of all its legal proceedings within his district, subject only to the general direction and supervision of the attorney-general. When other counsel are employed in these proceedings, it is to aid him in their management, not to assume his authority or direct his conduct. The position of Mr. Williams was solely that of assistant counsel. He could not control the proceedings in the case, or bind the government by his admissions or action.

And it appears also from the statement of the district attorney, that Mr. Williams at the time had been retained and paid as counsel by claimants of what are known as "outside lands;" that is, of lands within the asserted limits of the pueblo, but outside of the tract confirmed to the occupants by ordinances of the city, and the legislation of the state and the general government, and that the interests of these third parties, upon the question of excepting from the decree of confirmation the government reserves, were directly in conflict with those of the United States.

But there were other considerations which undoubtedly governed the conduct of the district attorney. Some of the statements made in the affidavit he knew were inaccurate, and the correctness of other statements he had good grounds to distrust. He was also influenced, as we have reason to believe, by a just sense of the impropriety of asking a district judge, though holding the circuit court, to vacate a decree rendered by the circuit judge, in a case of such magnitude and importance, immediately after that officer had left the state, not upon grounds apparent upon the record, but upon statements, the truth of which rested chiefly in the knowledge of the latter.

The district judge did not sit in any of the cases heard at the October term by the circuit judge, and it is a matter of regret that the benefit of his counsel and assistance was not had in the determination of the present case. The familiarity of that officer with the laws and customs and policy of Mexico in the disposition of her public domain, and in the establishment and endowment of her municipal bodies, would have greatly lessened the labor of investigating the case. But as he did not participate in its consideration, the district attorney, as we may suppose, naturally felt the indelicacy of asking any subsequent interference by him, which, under the circumstances, would have been to ask him to do an act of judicial discourtesy.

The attorney-general, in subsequently directing the district attorney to unite in the motion, was under the impression that it was the ordinary case of an application for a rehearing before the same judge who rendered the decision. When made acquainted with the circumstances, he directed the postpone-

ment of the motion until it could be heard by that officer. In the investigation of the case, the briefs of the special counsel were carefully examined. His first brief was handed by the clerk to the circuit judge the day on which the case was submitted, and the second brief was handed to him on the day of its presentation. Both were retained in his possession until after the decision was rendered and announced in court. Numerous other briefs bearing upon the question of the existence of a pueblo at the site of the present city of San Francisco upon the cession of the country, were also examined by him, particularly the elaborate brief of Mr. Nathaniel Bennett, late one of the justices of the supreme court of this state; the brief of the late Mr. Edmund Randolph, and the brief of Mr. Horace Hawes, of this city. These briefs were all upon the same side of the question taken by the "special counsel," and are characterized by great ability and learning, and until the appearance of the brief of that gentleman they were supposed to have exhausted the argument on that side.

These several briefs were received by the circuit judge without any indorsement by the clerk, and are still in his possession. The briefs of Mr. Williams were returned to the office of the clerk. But as it was generally understood at the time that he was retained by the occupants of "outside lands," and the district attorney knew of no other authority for his appearance as counsel, the clerk indorsed upon one of them the reason for not marking it filed, and upon the other brief that it was marked filed by mistake, and left them both in that condition among the papers of the case to be given to the author when called for. His action in this respect was at that time approved by the circuit judge. No such injurious suggestion was made, or if made, entertained for a moment, that Mr. Williams was also retained by the United States, and thus had a "divided duty" between the settlers and the government.

From these indorsements alone the special counsel drew his conclusion that his briefs were suppressed. Upon these indorsements alone, as he stated on the argument of this motion, he made the affidavit that he was "informed and believes" his briefs were suppressed and withheld from the circuit judge. His conclusion in this respect was illogical; there is no necessary connection between the indorsements made and the suppression alleged. The indorsements gave no such information as represented.

The subject provokes further comment, but we refrain, and will only observe that it is the first time within our judicial experience that any counsel has had the hardihood to make oath to what must necessarily have been with him only a matter of inference, and assuming his inference to be a fact has proceeded to cast imputations of misconduct upon officers of the court.

In the opinion rendered in this case, after stating that by the appeal on the part of the city the whole issue was open, the court said: "But though the whole issue is thus open, the dismissal of the appeal on the part of the United States may very properly be regarded as an assent by the government to the main facts upon which the claim of the city rests, namely: the existence of an organized pueblo, at the site of the present city, upon the acquisition of the country by the United States, on the seventh of July, 1846, the possession by that pueblo of proprietary rights in certain lands, and the succession to such proprietary rights by the city of San Francisco. The district attorney does not, therefore, deem it within the line of his duty to controvert these positions, but on the contrary, admits them as facts in the case, contending only that the lands appertaining to the pueblo were subject, until by grant from the proper authorities they were vested in private proprietorship, to appropriation to public uses by the former government, and since the acquisition of the country by the United States. He, therefore, insists upon an exception from the confirmation to the city of land heretofore reserved or occupied by the government for public use, and I do not understand that the counsel of the city objects to an exception of this character."

The views thus expressed of the effect which may justly be given to the dismissal of the appeal of the United States, the special counsel finds inconsistent with the views expressed in the case of Le Roy v. Wright [Case No. 8,273], and the concessions alleged to have been made by the district attorney he asserts are denied by that officer.

There is no inconsistency in the views expressed in the two cases. In Le Roy v. Wright [supra], certain officers of the army of the United States, acting under orders of the secretary of war, had taken possession of a tract of land adjoining the premises claimed by the complainant at Black Point, within the city limits, and commenced the erection of fortifications for the protection of the harbor of San Francisco, and had declared their intention to take like possession of the premises in controversy, and to appropriate them for the erection of barracks and other buildings required in connection with the fortifications. The complainant, by his suit, sought to restrain such appropriation until compensation to him for the property was previously made. He derived his title under the city of San Francisco, and, as evidence that the ownership of the property had been adjudged to the city as the successor of the former pueblo, he produced the decree of the board of land commissioners confirming her claim. As the appeal from this decree on the part of the United States had been dismissed by consent of the attorney-general, he regarded the decree as closing the controversy between

the city and the government as to the land to which the claim was confirmed, and so his counsel contended.

But the court held that in this view of the case the counsel was mistaken; that, had the city withdrawn her appeal, such result would have followed; but as she continued to prosecute it for an additional quantity beyond that confirmed, the whole issue was opened. The counsel of the United States was therefore allowed to introduce certain documents on file in the office of the surveyor-general of the United States for California, tending to show that a tract embracing the premises in question had been excepted and reserved from sale for public purposes, by order of the president, as early as November, 1850; evidence which had been inadvertently omitted when the case was pending before the board of land commissioners. It was not then pretended by counsel or held by the court, nor has it ever been pretended or held since, that the dismissal of the appeal by the United States was an act without any significance. On the contrary, the dismissal has always been regarded as an admission by the government of the main facts upon which the claim of the city rests. The land commissioners had adjudged that there was an organized pueblo at the site of the present city of San Francisco; that such pueblo held certain proprietary rights to land, and that the city had succeeded to those rights. The United States said in substance, through their highest legal officer, we admit the correctness of this adjudication; we acknowledge the law and the facts to be as there declared; and we consent that this recognition of the validity of the claim of the city to some lands shall be carried into the decree of the court. And it was so carried into the decree, and that decree still remains of record in full force. Although on appeal the whole issue be opened, this recognition of the rights of the city does not lose all efficacy as evidence on the new hearing. Admissions once made in a cause are not necessarily excluded from consideration because a second trial of the same issue is had.

The consent of the government thus remaining on the files of the court, and being embodied in its decree, the only questions of difficulty in the case necessarily related to the extent and boundaries of the claim of the city, and of the reservations of the government for public purposes.

In the statement filed by the district attorney, he mentions that, after the case had been submitted, one or more meetings were had at chambers before the circuit judge, and additional testimony put in and discussion had relative to the government reserves; and that "free conversations took place touching the law and the facts;" that he conceded that by repeated decisions of the supreme court of the state, the existence of a pueblo was the settled law; and that in view of this state of the law, in connection with the fact that the appeal on behalf of the United States had been dismissed by the attorney-general, he neither asked nor desired a re-examination of the question in this court.

To this statement, we will only add that the understanding of the circuit judge of the concessions made by the district attorney, and of the assent made by the counsel of the city with respect to lands reserved or occupied by the government for public purposes, was expressed in the paragraph cited above from his opinion. That paragraph was written after the "free conversations" of counsel before him, "touching the law and the facts," and it was read to the district attorney and to the counsel of the city before the opinion was delivered in court. Neither of these gentlemen expressed at the time any dissent from its language, or any intimation that the circuit judge had misapprehended the concessions, nor was any suggestion made by the district attorney, until after the opinion was published, that the statement of the concession was in any particular too broad and comprehensive.

These concessions, however, did not determine the case. They only obviated the necessity of setting forth a detailed statement of the evidence upon which the claim of the city rested. Referring to them, the opinion says: "It is unnecessary, therefore, to recite the historical evidence of the existence of a pueblo previous to and at the date of the acquisition of the country at the present site of the city of San Francisco, which is very fully presented in the elaborate opinion filed by the commission on the rendition of its decision. Since that decision was made the question has been considered by the supreme court of the state, and, in an opinion in which the whole subject is examined, a similar conclusion is reached: and if anything were wanting, in addition to the arguments thus furnished, it is found in the able and exhaustive brief of the counsel of the city."

The decision was based upon the documentary evidence found in the record, and the action of the officers of the government after the conquest.

"The documents," says the opinion, "of undoubted authenticity, to which the opinions and brief of counsel refer, establish beyond controversy the fact that a pueblo of some kind, having an ayuntamiento composed of alcaldes, regidores, and other municipal officers, existed as early as 1834, and that the pueblo continued in existence until and subsequent to the cession of the country. The action of the officers of the United States in the government of the city, and the appointment or election of its magistrates after the conquest, both preceding and subsequent to the treaty of peace, proceeded upon the recognition of this fact; and the titles to prop-

erty within the limits of the present city, to the value of many millions, rest upon a like recognition."

We have thus disposed of the main positions upon which the motion rests. The affidavit, it is true, contains several other matters; it details at some length the connection of the special counsel with the case, and it gives an account of communications made to the public journals of the city in relation to the decision of the court and the brief of counsel, but it is not perceived that these particulars, however interesting in themselves, have any pertinency to the motion presented. The affidavit also attempts to state what the special counsel contended for in his brief, but as this appeared by the brief itself, which was considered by the court previous to the decision, no information is imparted by the statement.

It follows that the motion to open the decree and to grant a rehearing must be denied. It only remains to dispose of that part of the motion which asks that the order granting the appeal be vacated. We are disposed to think that a vacation of the order was only desired as a preliminary to the opening of the decree. Of course, if the United States desire the appeal to be withdrawn, their wishes in this respect will be carried out. The order denying the motion generally will therefore be subject to their right to renew the motion in this particular. Motion denied.

When the judgment of the court was announced that the motion would be denied, it was suggested by counsel for parties claiming lands within the four square leagues confirmed, that the decree of the court, entered on the second of November last, did not embody with entire precision the decision expressed by the opinion of the court delivered at the time, and that said decree should be modified in some respects in its language, in order to avoid any uncertainty or doubt as to its purport and meaning. It was therefore ordered, the attorneys of the city consenting thereto, that the entry of the order denying said motion be stayed until counsel could be heard for a modification of the decree, so that a modification, if allowed, might be made at the same time as the entry of the order denying the motion.

Subsequently, on the eighteenth of May, 1865, counsel having been heard on the suggestion, the order denying the rehearing was entered, and with it an order vacating the previous decree, and directing that in lieu thereof the following decree be entered as the final decree in the cause, which was accordingly done:

"The City of San Francisco v. The United States.

"The appeal in this case taken by the petitioner, the city of San Francisco, from the decree of the board of land commissioners to ascertain and settle private land claims in the state of California, entered on the twenty-first day of December, 1854, by which the claim of the petitioner was adjudged to be valid, and confirmed to lands within certain described limits, coming on to be heard upon the transcript of proceedings and decision of said board, and the papers and evidence upon which said decision was founded, and further evidence taken in the district court of the United States for the Northern district of California pending said appeal—the said case having been transferred to this court by order of the said district court, under the provisions of section four of the act entitled 'An act to expedite the settlement of titles to lands in the state of California,' approved July 1, 1864—and counsel of the United States and for the petitioner having been heard, and due deliberation had, it is ordered, adjudged, and decreed that the claim of the petitioner, the city of San Francisco, to the land hereinafter described, is valid, and that the same be confirmed.

"The land of which confirmation is made is a tract situated within the county of San Francisco, and embracing so much of the extreme upper portion of the peninsula above ordinary high-water mark (as the same existed at the date of the conquest of the country, namely: the seventh of July, A. D. 1846), on which the city of San Francisco is situated, as will contain an area of four square leagues—said tract being bounded on the north and east by the Bay of San Francisco; on the west by the Pacific Ocean; and on the south by a due east and west line drawn so as to include the area aforesaid, subject to the following deductions, namely: Such parcels of land as have been heretofore reserved or dedicated to public uses by the United States; and also such parcels of land as have been by grants from lawful authority vested in private proprietorship, and have been finally confirmed to parties claiming under said grant, by the tribunals of the United States, or shall hereafter be finally confirmed to parties claiming thereunder by said tribunals, in proceedings now pending therein for that purpose; all of which said excepted parcels of land are included within the area of four square leagues above-mentioned, but are excluded from the confirmation to the city. The confirmation is in trust, for the benefit of the lot-holders under grants from the pueblo, town, or city of San Francisco, or other competent authority, and as to any residue, in trust for the use and benefit of the inhabitants of the city.

     "FIELD. Circuit Justice.

"San Francisco, May 18, 1865."

From this decree and directly after its entry, both parties moved for an appeal to the United States supreme court. The motions were denied, the court filing the following opinion, giving its reasons for the denial:

FIELD, Circuit Justice. Both parties to this case desire to appeal from the final decree entered on the eighteenth instant—the United States from the whole of the decree,

and the city of San Francisco from so much of the decree as includes in the estimate of the quantity of four square leagues confirmed, the parcels of land which have been reserved or dedicated to public uses by the United States.

When the appeal from the decree as originally entered on the second of November last was allowed, it was supposed, without examination, that an appeal would lie to the supreme court. Since then our attention has been called to the act of July 1, 1864 [13 Stat. 333], under which the circuit court acquired its jurisdiction, and to the fact that it makes no provision for a review of the decisions of the court.

The jurisdiction of the supreme court, under previous acts of congress, over the judgments and decrees of the circuit court, is limited to a review of final judgments and decrees in cases originally instituted in that court, or transferred to it from the courts of the several states, or removed to it by appeal or writ of error from the district courts of the United States. The judiciary act of September 24, 1789, § 22 (1 Stat. 73); the act of March 3, 1803, § 2, in addition to the judiciary act (2 Stat. 244); the act of July 4, 1836, § 17, to promote the progress of the useful arts (5 Stat. 124); the act of July 4, 1840, § 3, in addition to the acts respecting the judicial system of the United States (5 Stat. 392); the act of May 31, 1844, amending the judiciary act (5 Stat. 658).

The act of March 3, 1851 [9 Stat. 631], to ascertain and settle private land claims in the state of California, does not provide for any consideration by the circuit court of cases of this character. The jurisdiction over these cases is by that act vested, in the first instance, in a board of commissioners, and afterward on appeal from the decision of the board, in the district court. From the decrees of the district court an appeal lies directly to the supreme court.

The act of July 1, 1864 [13 Stat. 333], authorizes a transfer from the district court to the circuit court of cases of this kind, where the district judge is interested in the land, the claim to which is pending before him, and also where the case affects the title to lands within the corporate limits of any city or town; but it does not confer any right of appeal from the action of the circuit court in these cases after they are transferred.

The supreme court, by the constitution, takes its appellate jurisdiction over cases "with such exceptions and under such regulations as the congress shall make." And the designation, by acts of congress, of the cases to which this jurisdiction shall extend, has been held to be a legislative declaration that all other cases are excepted from it.

"When the first legislature of the Union," says Mr. Chief Justice Marshall, "proceeded to carry the third article of the constitution into effect, they must be understood as intending to execute the power they possessed of making exceptions to the appellate jurisdiction of the supreme court. They have not, indeed, made these exceptions in express terms. They have not declared that the appellate power of the court shall not extend to certain cases; but they have described affirmatively its jurisdiction, and this affirmative description has been understood to imply a negative on the exercise of such appellate power as is not comprehended within it." Durousseau v. U. S., 6 Cranch [10 U. S.] 307. And, in illustration of this principle, reference is made to the provision of the law which allows a writ of error to a judgment of the circuit court, where the matter in controversy exceeds the value of $2000. "There is no express declaration," says the chief justice, "that it will not lie where the matter in controversy shall be of less value. But the court considers this affirmative description as manifesting the intent of the legislature to except from its appellate jurisdiction all cases decided in the circuits where the matter in controversy is of less value, and implies negative words."

It follows, therefore, that the appellate jurisdiction of the supreme court exists only in those cases in which it is expressly granted. In conformity with this principle, it has been held that such jurisdiction does not extend to final judgments in criminal cases, it not having been conferred by congress. A question arising in a criminal case can only be brought before the supreme court for decision upon a certificate of a division of opinion between the judges of the circuit court. Forsyth v. U. S., 9 How. [50 U. S.] 571. So under the judiciary act of 1789 [1 Stat. 73], jurisdiction to review a judgment or decree of the circuit court, rendered in an action brought before it from the district court on writ of error, was denied, as the act only mentioned judgments and decrees brought before the circuit court on appeal from the district court. U. S. v. Goodwin, 7 Cranch [11 U. S.] 108. And in Barry v. Mercein, 5 How. [46 U. S.] 120, it was decided that under the twenty-second section of the judiciary act, which provides for a review by the supreme court of final judgments and decrees of the circuit court, where the matter in dispute exceeds the sum or value of $2000, the appellate power of the court did not exist unless the matter in dispute was money, or some right, the value of which in money could be calculated and ascertained. In that case the controversy was between parents for the custody and care of their child, a matter, as justly observed, rising superior to all money considerations; yet the court refused to entertain jurisdiction, observing that there were no words in the law which, by any just interpretation, could be held to authorize it to take cognizance of cases to which no test of money value could be applied; that a similar limitation upon its appellate power existed with reference to judgments in criminal cases, although the liberty or life of the party

might depend on the decision of the circuit court; and that inasmuch as it could exercise no appellate power unless it was conferred by act of congress, the writ of error issued in the case must be dismissed. [Barry v. Mercein] 5 How. [46 U. S.] 103.

From these authorities—and others to the same effect might be cited—it is clear that in the absence of any provision in the act of July 1, 1864, giving a right of appeal from the decision of the circuit court in the present case, the right does not exist.

Nor is the absence of such provision an oversight on the part of congress. It is evident, we think, from the general language of the act, and the object sought to be accomplished by it, that it was the intention of the legislature to give finality to the action of the circuit court in the cases transferred to its jurisdiction.

The act was designed, as its name purports, to expedite the settlement of titles to land in the state. Great delays and embarrassments were found to exist in determining the location and boundaries of tracts confirmed after the question of title had been adjudicated. The hearing by the district court of exceptions to surveys returned by the surveyor-general, interposed by parties possessing or asserting adverse interests, the taking of depositions, the discussion of counsel, and the modifications or new surveys sometimes ordered, necessarily occupied the time usually taken by an ordinary suit at law. Then followed the right of appeal to the supreme court from the action of the district court, not merely by the original contestants to the proceeding, but by third parties intervening, whether adjoining proprietors, purchasers under the original grantee, or persons claiming by pre-emption, settlement, or other right under the United States. To obviate the delays and expense necessarily attending proceedings of this character, particularly as occasioned by the appeal to the supreme court, and to relieve that tribunal, already burdened by a crowded docket, the act limited its jurisdiction to cases in which appeals were then pending, and vested jurisdiction in the circuit court, over cases in which appeals might be subsequently taken. When from the decree of the district court, approving or correcting the survey, no appeal had been taken, "no appeal," says the act, "to that court shall be allowed, but an appeal may be taken, within twelve months after this act shall take effect, to the circuit court of the United States, for California, and said court shall proceed to fully determine the matter."

Following these provisions is the section which directs that when the district judge is interested in any land, the claim to which, under the act of March 3, 1851 [9 Stat. 631], is pending before him on appeal from the board of commissioners, the case shall be transferred to the circuit court, "which shall thereupon take jurisdiction and determine the same." The act then proceeds as follows: "The said district courts may also order a transfer to the said circuit court of any other cases arising under said act, pending before them, affecting the title to lands within the corporate limits of any city or town, and in such cases both the district and circuit judges may sit."

At the passage of the act there were only two cases pending in the district courts of California, with reference to which the authority conferred by this last clause could be exercised—the Case of the City of San Francisco, and the Case of the City of Sonoma, both against the United States. The first case had then been pending in the district court for over eight years. In the meantime the city had extended in all directions, and interests of vast magnitude had grown up which demanded that the title to the land upon which the city rested should be, in some way, speedily and finally settled. The land commissioners had adjudged that the claim of the city was valid within certain described limits. The United States, through their highest legal officer, had assented to this adjudication; and the decree of the district court, declaring its finality as against the government, had been on record for years, and was then in full force. And by the act itself the United States relinquished whatever right and title they possessed to the land within the charter limits of 1851.

The Case of the City of Sonoma had been likewise pending in the district court on appeal for over eight years. In this case the United States had, through the attorney-general, signified their assent to a confirmation of the decree of the board, and the notice of prosecuting the appeal on the part of the city had not been given within the six months prescribed by the act of congress. It was under these circumstances that the law was passed authorizing a transfer of these cases to the circuit court. If an appeal from its action had been intended, no beneficial object would have been accomplished by the transfer for the same delay would follow an appeal from the circuit court as would follow an appeal from the district court. Nor can any reason in that view be assigned for allowing both the district and circuit judges, if they desired, to sit in the hearing of these cases.

If the matter were less clear we might yield to the suggestion of counsel, and allow the appeal pro forma; but as we have no doubt whatever that our decision is final, our duty is plain. We might with equal propriety sign a citation upon an appeal under the twenty-second section of the judiciary act where the matter in dispute is less than the sum or value of two thousand dollars.

The decision not being subject to appeal, the controversy between the city and the government is closed. and the claim of the city stands precisely as if the United States had owned the land and by an act of con-

gress had ceded it, subject to certain reservations, to the city in trust for the inhabitants. Motions to allow an appeal denied.

Subsequently, upon application of the attorney-general, the supreme court of the United States ordered an appeal to be allowed. The opinion of the court upon the application is reported in [U. S. v. Circuit Judges] 3 Wall. [70 U. S.] 673. An appeal was accordingly allowed, but whilst it was pending congress passed the following act, which was approved March 8, 1866 [14 Stat. 4]: "An act to quiet the title to certain lands within the corporate limits of the city of San Francisco: Be it enacted by the senate and house of representatives of the United States of America in congress assembled: That all the right and title of the United States to the land situated within the corporate limits of the city of San Francisco, in the state of California, confirmed to the city of San Francisco by the decree of the circuit court of the United States for the Northern district of California entered on the eighteenth day of May, 1865, be and the same are hereby relinquished and granted to the said city of San Francisco and its successors, and the claim of the said city to said land is hereby confirmed, subject, however, to the reservations and exceptions designated in said decree, and upon the following trusts, namely: That all the said land not heretofore granted to said city shall be disposed of and conveyed by said city to parties in the bona fide actual possession thereof, by themselves or tenants, on the passage of this act, in such quantities and upon such terms and conditions as the legislature of the state of California may prescribe, except such parcels thereof as may be reserved and set apart by ordinance of said city for public uses. Provided, however, that the relinquishment and grant by this act shall not interfere with or prejudice any valid adverse right or claim, if such exist, to said land or any part thereof; whether derived from Spain, Mexico or the United States, or preclude a judicial examination and adjustment thereof."

At the December term of the supreme court for 1866, the term following the passage of this act, the appeal of the United States, and the appeal of the city were both dismissed by stipulation of the attorney-general and counsel of the city. Townsend v. Greeley, 5 Wall. [72 U. S.] 337.

The title of the city of San Francisco, therefore, rests upon the above decree of the circuit court, entered on the eighteenth of May, 1865, and the above confirmatory act of congress. Upon this subject, and referring to the above act, the supreme court of the United States, in Grisar v. McDowell, said: "By this act the government has expressed its precise will with respect to the claim of the city of San Francisco to her lands, as it was then recognized by the circuit court of the

United States. In the execution of its treaty obligations with respect to property claimed under Mexican laws, the government may adopt such modes of procedure as it may deem expedient. It may act by legislation directly upon the claims preferred, or it may provide a special board for their determination, or it may require their submission to the ordinary tribunals. It is the sole judge of the propriety of the mode, and having the plenary power of confirmation it may annex any conditions to the confirmation of a claim resting upon an imperfect right, which it may choose. It may declare the action of the special board final; it may make it subject to appeal; it may require the appeal to go through one or more courts, and it may arrest the action of board or courts at any stage. The act of March 3, 1851 [6 Stat. 631], is a general act applying to all cases, but the act of March 8, 1866 [14 Stat. 4], referring specially to the confirmation of the claim to lands in San Francisco, withdrew that claim as it then stood from further consideration of the courts under the provisions of the general act. It disposed of the city claim, and determined the conditions upon which it should be recognized and confirmed. The title of the city, therefore, rests upon the decree of the circuit court as modified by the act of congress." See, also, Montgomery v. Bevans [Case No. 9,735].

NOTE A. The following extracts are from the opinion of the supreme court of the state, in Hart v. Burnett, reported in 15 Cal.:

"On the third of November, 1834, the territorial deputation authorized the election of an ayuntamiento, to reside at the presidio of San Francisco, to be composed of an alcalde, two regidores or councilmen, and a sindico-procurador. The ayuntamiento, when organized, was to exercise the political functions pertaining to such office, and the alcalde was also to perform the judicial functions which the laws conferred upon him. This decree was communicated to the military commandant by the governor, on the fourth of November, 1834. An election was accordingly held on the seventh of December, 1834, at the presidio of San Francisco, and the ayuntamiento duly installed. A similar election was held on the thirteenth of December of the following year (1835), at the same place, which was then officially designated as the pueblo of San Francisco. Other elections of the same character were subsequently held; and there are numerous official documents of undisputed authenticity, which refer to the 'ayuntamiento of San Francisco,' 'the alcalde of San Francisco,' and to the 'pueblo of San Francisco,' proving, as we think, beyond a doubt, that there was at that place, in 1834, 1835, 1836, and subsequently, a pueblo of some kind, with an ayuntamiento composed of alcaldes, regidores, and other municipal officers. What were the rights of this municipality, and what were the powers of its officers, and the extent of its territory and jurisdiction, we shall not now inquire. We here refer merely to the fact of the existence, at that time, and at that place, of such an organization, whether corporate or incorporate. And that fact is proved by the official returns of elections, by the official acts of the governor and of the territorial or departmental legislature, by the official correspondence of government officers, and by the acts, proceedings, records, and correspondence of the

officers of the pueblo itself. As a part of the evidence of this fact, we refer to the election returns of December 7, 1834, December 13, 1835, December 3, 1837, and December 8, 1838; to the governor's letters of January 31, 1835, October 26, 1835, January 19, 1836, January 17, 1839, and November 14, 1843; to the expediente of proceedings between May and November, 1835, with respect to certain persons obliged to serve as municipal officers of that pueblo; and to the official correspondence between the alcaldes of that pueblo and the various officers of the territorial or departmental government of California." 15 Cal. 540.

"The evidence in favor of the existence of a pueblo in San Francisco prior to July 7, 1846, and its general right, for pueblo purposes, to four square leagues of land, to be measured, according to the ordinanzas, from the center of the plaza at the presidio, is, to our minds, irresistible. 1st. We have the general laws of Spain and the Indies authorizing the formation of pueblos, assigning their general boundaries, directing how they were to be surveyed out, designating the uses to which such lands were to be devoted, and defining the character or the right which the pueblo acquired in them, and the control which its municipal authorities, as well as the king and his officers, were to exercise over them. 2d. We have the special orders of the king, and the highest officers of his government, with respect to the establishment of pueblos in California, and more particularly for the conversion of presidios into pueblos, and the extent of land assigned to the pueblos so formed. 3d. We have documentary evidence showing that at a very early period, and almost immediately after the discovery of the Bay of San Francisco, the viceroy and governor of California contemplated the establishment of a pueblo at this identical point, and that the foundation of the presidio and mission of San Francisco, in 1776, was then considered and so announced as merely preliminary to the organization of a great town, into which they were to be converted as soon as a sufficient number of settlers could be procured for that purpose. 4th. We have documentary evidence of unquestionable authenticity, showing that the governor and territorial deputation, in 1834, ordered an election at the presidio of an ayuntamiento, consisting of an alcalde, two regidores and a syndico—officers recognized by law as belonging only to pueblos: that this and subsequent elections of the same kind were held at the same place; and that such municipal organization was then, and has been ever since, recognized in numerous official documents signed by the different governors, secretaries of state, and other government officers, as the 'pueblo of San Francisco,' or the 'pueblo of San Francisco de Asis.' 5th. We have documentary evidence showing that the political chiefs, deputations, and other government officers, recognized, in numerous official papers, that this pueblo had some interest in, and its municipal authorities some control over, the lands within the general limits of four square leagues; and that, at different periods, they were authorized to grant in particular localities within such limits, small parcels of these lands to private persons in full ownership; and 6th. We have documentary evidence showing that the municipal officers of this pueblo did, for a long term of years, both before and since the conquest, exercise this authority, by granting small lots of land to numerous individuals, and that their power was recognized both by the Mexican government in California, and by the government of military occupation which succeeded it." 15 Cal. 563, 564.

NOTE B. Documentary evidence relating to the pueblo of San Francisco from the end of 1834 to July 7, 1846. The following synopsis of original papers, of undoubted authenticity,

from the archives, city claim, limantour, etc., will serve to prove, if further evidence be required, the correctness of the opinion of the court (supreme court of California) on this (the existence of a pueblo at the site of the present city of San Francisco) and some other points:

January 31, 1835, Governor Figueroa writes to M. G. Vallejo, military commandant of San Francisco, acknowledging the receipt of a letter from the latter, dated January 1, and thanking him for having constitutionally installed "the ayuntamiento of that pueblo" (el ayuntamiento de este pueblo).

June 22, 1835, Governor Figueroa sends a circular to the military commandant and alcalde of San Francisco. This is indorsed by the alcalde, Francisco de Haro, as having been received and published by him, in "San Francisco de Asis, July 12, 1835." It will be seen from this that even at that early day—the first year of the formation of the pueblo, and organization of the ayuntamiento, at the presidio—it was called by the official authorities, without distinction, "San Francisco," and "San Francisco de Asis." Soon after this Jose Joaquin Estudillo applied for a grant of two hundred varas, in the place called Yerba Buena. This application was for a larger amount of land than that designated for house-lots, and consequently the matter was referred to the territorial deputation. On the twenty-second of September, that body, on motion of Alvarado, resolved generally, that the ayuntamiento of San Francisco had authority to grant solares in the place of Yerba Buena, at a distance of two hundred varas from the beach.

September 23, 1835, Governor Castro transmitted to the "alcalde constitutional of San Francisco," a copy of the foregoing resolution of the territorial deputation, with respect to the power of "the ayuntamiento of San Francisco" to grant lots two hundred varas distant from the sea-shore "in the place called Yerba Buena." October 28, he addresses another official letter to the "alcalde of San Francisco de Asis," containing a brief statement of the substance of the resolution of September 22, and directing him to inform the residents of "that pueblo" not to apply to the political chief for lots, "as it is one of the favors which the ayuntamiento can grant." For these grants a canon was to be paid to the ayuntamiento.

There is filed in the city claim a certified copy, from the archives, of an old expediente, which contains several important papers. It begins with a petition to the "gefe politico," dated May 30, 1834, and purporting to be signed by residents of the ranchos of San Pablo, etc., asking to be separated from the jurisdiction of the port of San Francisco, and annexed to that of San Jose. They allege, as reasons for the proposed change, the distance, the difficulty and danger of crossing the bay, and the want of accommodations for themselves and families at the presidio, "for a whole year, when they shall be called upon to discharge some office in the ayuntamiento," etc. This petition was, by the territorial deputation; on the fifth of September, 1835, ordered to be referred to the "ayuntamientos of the pueblos of San Jose and San Francisco," for reports; and the governor so referred it on the twenty-eighth of September. November 4, the ayuntamiento of San Jose reports in favor of the petition, with the remark that the petitioners had previously pertained to that jurisdiction. December 20, the "ayuntamiento of San Francisco" reports against the petition, denying the genuineness of the signatures to it, and the correctness of its statements. With respect to the want of accommodations at the presidio, it says: "It is a well-known and established fact, that the military commandant of the presidio furnished houses to the functionaries of the present ayuntamiento as soon as it was installed." This report is dated, "Port of San Francisco," and is signed

by the alcalde, Francisco de Haro, and the secretary, Francisco Sanchez.

1836, January 2, Governor Castro directs a communication to the "illustrious ayuntamiento of San Francisco de Asis," informing it that he had transferred the political government of the territory to General Nicolas Gutierrez. On the same day Gutierrez directs a communication to the "illustrious ayuntamiento of San Francisco," informing that body that he had been placed in possession of the political government of the territory.

1836, January 22, the alcalde, Jose Joaquin Estudillo, directs an official communication to the sindico-procurador, dated at the "pueblo of San Francisco de Asis."

1836, January 19, Governor Gutierrez transmits to the "alcalde of San Francisco de Asis," a copy of an order received from the supreme government of Mexico.

1836, December 13. Governor Alvarado transmits to the "very illustrious ayuntamiento of San Francisco," copies of decrees of the congress of the "sovereign state of Alta California."

1837, January 2, Alcalde Martinez sends to the sindico-procurador an order for paper for use of the "office of this ayuntamiento." It is dated, "Pueblo of San Francisco." There are various other official papers signed by Martinez, which are dated in the same way. Francisco Sanchez, as secretary of "this illustrious ayuntamiento," signs various official papers dated "Pueblo of San Francisco." In one case he dates "Presidio," and in some others "Yerba Buena."

1837, August 4, Jose Carrillo appeared as the commissioner from the departmental government, to administer the oath to "this municipality," of obedience to the constitution of 1836. The acta states that it was sworn to by the "first alcalde of the port of San Francisco de Asis."

1837, December 3, the primary election "in the pueblo of San Francisco de Asis," is certified to have been held in the "plaza of said pueblo." The return is certified by Francisco de Haro, as president; Francisco Guerrero and Francisco Sanchez, as secretaries; and A. M. Peralta and J. de la C. Sanchez as inspectors. The letter transmitting these returns is dated "San Francisco, December 7, 1837," and directed to the "constitutional alcalde, Ignacio Martinez." At the secondary election, the returns of which were transmitted to the governor on the twenty-third, William A. Richardson was chosen alcalde; but he having applied to the governor to be excused from serving as such, for the ensuing year, Alvarado on the thirtieth, directed a letter to the "constitutional alcalde of San Francisco," ordering a new election, which was held January 8, 1838, and Francisco de Haro elected alcalde in place of Richardson. Domingo Sais was, at the same time, elected second rejidor, which office, it appears, was also vacant. * * *

1839, January 17. Governor Alvarado transmits to Alcalde de Haro a proclamation for putting into effect the constitutional system of 1837. and for holding elections according to the law of November 30. 1836, which he says he received from "the supreme government by the last mail!"

1839. January 18. Governor Alvarado sends another official communication directed "to the alcalde of San Francisco," in which he states that inasmuch as many individuals had asked for solares for building houses in the lands of Yerba Buena, which had previously been prohibited from being granted, and he was desirous of advancing the commerce in that recent congregation of vecinos, he therefore had decreed (dispuesto) that grants for house-lots may be made of any part of said prohibited lands; with the understanding, however, that those asking for such concessions shall present to the government their petitions for the favor, with the

necessary reports, or informes. The alcalde is directed to give notice of this to the vecinos.

1839. January 25, Governor Alvarado directs a proclamation "to the alcalde of San Francisco," and orders him to give in due publication.

1839, February 28, Governor Alvarado directs "to the illustrious ayuntamiento of San Francisco" his proclamation of the previous day (twenty-seventh), dividing all California, from the frontier of the north to Cape St. Lucas, into three districts, the First district including all north of the ex-mission of San Luis Obispo. This district was divided into two partidos, one extending from the north of Sonoma to the Llagas, with Dolores as the cabacera, and the other from the Llagas to San Luis Obispo, with the pueblo of San Juan de Castro as the cabacera. He also informs that body of the appointment of Jose Castro as prefect of that district, and that he must be recognized and obeyed according to the laws.

1839, March 9, Governor Alvarado sends "to the alcalde of San Francisco" a proclamation, and directing that the notice be given that all petitions for lands or other things should be transmitted to the secretary through the prefects, for their reports thereon. During the early part of this year Francisco de Haro continued to act as "alcalde." but about the middle or a little after, Francisco Guerrero assumed the duties of juez de paz, and continued to act in that capacity till the end of 1841. when he was succeeded by Francisco Sanchez, who held that office to the end of 1843, when the election was held for two "alcaldes of nomination," under the new organization made by Micheltorena.

1843, May 23, Francisco Sanchez, as "juez de paz of the jurisdiction of the port of San Francisco," issues an order to the owners of gardens "in the establishment of Dolores," respecting irrigation. He dates this order in "San Francisco."

1843, November 14, Governor Micheltorena issues a proclamation restoring. in part, the old system of ayuntamientos, and discontinuing the prefects from the beginning of the coming year. The pueblo of San Francisco was to elect, on the following December, two alcaldes, of first and second nomination, the first to act as judge of first instance and to take charge of the prefecture. At this election William Hinckley was elected alcalde of first nomination, and Francisco de Haro alcalde of second nomination. The former resided at Yerba Buena, and the latter at the old mission.

1844, January 20. Secretary Jimeno writes to the "first alcalde of the port of San Francisco," congratulating him. in the name of the governor. on his election. and hopes he will devote himself to the public welfare. and the improvement of that town and its vicinity.

1844, March 6. Secretary Jimeno directs two official communications to the "first alcalde of San Francisco."

1844, March 14, Jimeno directs an official communication to "the alcalde of first nomination of the port of San Francisco."

1844, March 30, the superior tribunal addresses an official communication to "William Hinckley, alcalde of first nomination of San Francisco." April 29, the tribunal addresses him as "first constitutional alcalde in San Francisco de Asis:" on June 4. as "first alcalde of San Francisco;" and on October 29, as "first juez of San Francisco," etc. There are various official documents extant, addressed to him by the governor, the secretary, the military commandant, and other government officers, as "alcalde of San Francisco," "alcalde of San Francisco de Asis," "alcalde of the port of San Francisco," "alcalde of the pueblo of San Francisco," "alcalde of the pueblo of San Francisco de Asis," "alcalde of Yerba Buena," "juez of first nomination of the pueblo of San Francisco de Asis," etc. Of the local authorities and private persons, some addressed him as "alcalde

of San Francisco," some as "alcalde of San Francisco de Asis," some as "alcalde of Yerba Buena," some as "alcalde of the pueblo of San Francisco," etc., etc. Hinckley dated his official papers, sometimes, "pueblo of San Francisco," sometimes, "court of first nomination of San Francisco de Asis," "Yerba Buena," etc., etc. In the official correspondence between him and the second alcalde, the former residing at Yerba Buena, and the latter at the Mission, their letters are dated, indiscriminately, "San Francisco," "San Francisco de Asis," "pueblo of San Francisco," etc. At that time, at least, no distinction was made in the use of these names. On the 12th of November an order was issued by the governor, and directed to the "first alcalde of San Francisco," to hold an election of alcaldes on the first Sunday in December, for the coming year. On the fifth of December Hinckley issued a notice, dated "San Francisco de Asis," for an election to be held in "Dolores," on Sunday, the eighth, for first and second alcaldes, no election having been held on the previous Sunday. At the secondary election, held December 15, Juan Padilla was chosen first alcalde, and Jose de la Sanchez second alcalde. In the returns it is described as an election "in the pueblo of San Francisco de Asis;" and these returns are sent to Hinckley, who resided at Yerba Buena, and is addressed as "first alcalde of San Francisco de Asis." Hinckley writes an official letter, dated "pueblo of San Francisco de Asis." and sends it to De Haro, at the Mission, addressed to the "alcalde of second nomination of San Francisco de Asis."

1845. In the official correspondence of this year, Padilla and Sanchez are addressed as "first and second alcaldes;" sometimes "of San Francisco," sometimes "of San Francisco de Asis," and sometimes "of the pueblo of San Francisco," etc., etc. On the twelfth of October, of this year, Sanchez issued a proclamation, dated at "Yerba Buena," in which he styles himself "constitutional alcalde of the jurisdiction of San Francisco."

1846. Sanchez continued to act as alcalde during the early part of this year; and, after him, Jose Jesus Noe seems to have officiated until July. Noe is called, in the official documents, "alcalde of San Francisco," "juez of San Francisco," "alcalde of first nomination," "juez de paz," etc., etc. The officers appointed and elected after the military possession by the United States, in July, at first assumed the title of "magistrate," but very soon afterwards adopted the Spanish word "alcalde," which was continued until 1850.

The foregoing is but a brief synopsis of a very small number of the official papers and records still existing. They are sufficient, however, to show the correctness of the reasoning of the court on this point, and to disprove the absurd theories which have been raised by interested parties, about the different names applied, in old documents, to the pueblo generally, and to particular localities. The attempt of Richardson, and other Limantour witnesses, to ignore the pueblo of San Francisco, which was organized at the end of 1834, and to erect a new "pueblo of Yerba Buena," with a little plat of land between California and Dupont streets, and the beach, is so thoroughly exploded by the official records as to deserve not the slightest consideration. Note 5 to opinion in Hart v. Burnett, by a member of the California bar.

(This member of the bar was the late General Halleck, of the U. S. army, who, while secretary of state, under the government of General Riley, and afterward, while practicing his profession of the law in San Francisco, had given great attention to the subject of land titles in California, and particularly to the claims of pueblos existing upon the acquisition of this country to lands embracing the sites of such pueblos, or within their immediate vicinity.)